(Not for publication)                                                    (Docket Entry No. 4)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                          :
WILLIAM JOSKO, individually and t/a       :
GOVERNMENT TECHNOLOGIES GROUP,            :
                                          :
                    Plaintiff,            :       Civil No. 05-4013 (RBK)
                                          :
        v.                                :       **OPINION**
                                          :
NEW WORLD SYSTEMS CORPORATION,            :
                                          :
                    Defendant.            :
                                          :
_____:


**KUGLER**, United States District Judge:

    This matter comes before the Court upon Defendant New World Systems Corporation's

Motion to Dismiss, or in the Alternative, Transfer Venue.  For the following reasons, the Court

will grant in part and deny in part the Defendant's motion.

## I.  BACKGROUND

    Plaintiff William Josko ("Josko") brings this suit, both individually and together as

Government Technologies Group ("GTG"), against Defendant New World Systems Corporation

("New World").  New World is a Michigan corporation that "develops, markets, and supports

integrated standard software solutions for use by local and state governments." (Def. Mem. at 2.)

    In August 1996, New World entered into a dealer agreement with Josko and GTG

(collectively "Plaintiffs").  Pursuant to the terms of that agreement, Plaintiffs obtained the non-

exclusive right to solicit customers for New World products in New Jersey, Delaware, and a specified area in eastern Pennsylvania. (Matterne Aff. ¶ 3.)  In the first three years following the 1996 agreement, New World apparently considered Josko to be a talented salesman; however, in 2000, tension developed between the parties as Plaintiffs' sales began to fall below New World's expectations. (Id. ¶¶ 5, 8.)  New World also contends that Josko began having financial problems that allegedly caused him to make frequent demands for cash advances and resulted in Plaintiffs' failure to make timely expense payments. (Id. ¶¶ 6, 7.)

In an attempt to remedy these issues, the parties began negotiating a new dealer agreement. (Id. ¶ 8, 9).  Josko's counsel advised him through the negotiation process which lasted several weeks. (See id. ¶ 8, 9; Matterne Aff., Exhibit 1.)  Ultimately, the parties entered into a new dealer agreement effective March 7, 2003 ("2003 Dealer Agreement"). (See Matterne Aff., Exhibit 3.)  The 2003 Dealer Agreement contained, among other things, (1) a choice of law clause stating that the 2003 Dealer Agreement would be governed and construed in accordance with Michigan law; (2) a confidentiality clause prohibiting Plaintiffs from disclosing New World's confidential and proprietary information; (3) various non-competition clauses; (4) a termination clause providing that the 2003 Dealer Agreement would continue for one year and would automatically renew each year unless either party terminated it by giving written notice sixty days before the anniversary date; and (4) an arbitration clause stating that all disputes relating to the 2003 Dealer Agreement, except for those involving a breach of the confidentiality clause, would be submitted to arbitration in Oakland County, Michigan. (See id. §§ 2.8, 2.9, 3.1, 3.2, 3.3.)

Despite the parties' re-negotiated agreement, their business relationship did not last.  New

World alleges that by October 2004, Plaintiffs had (1) persistently failed to meet their annual sales quotas, (2) failed to attend required meetings, (3)  remained preoccupied with their own personal financial problems, and (4) portrayed a reduced interest in promoting New World products. (Matterne Aff. ¶ 14.)  For these reasons, New World claims it had adequate cause to terminate the 2003 Dealer Agreement. (Id.)  Therefore, on October 14, 2004, New World's President, Larry Leinweber, verbally informed Josko of its intention to terminate the 2003 Dealer Agreement on the next anniversary date. (Id. ¶ 15.)  However, during that conversation, Leinweber allegedly told Josko that New World wished to terminate the agreement on more favorable terms than provided for in the 2003 Dealer Agreement. (Id.)

Thereafter, on November 20, 2004, David Matterne, the Vice President of New World's Finance and Administration Department, sent Plaintiffs a written notice of termination, which did not specify whether the termination was for cause.  (Id. ¶ 15; see Compl., Exhibit A.)  In response, Josko's counsel sent New World a letter dated December 7, 2004 wherein Josko demanded certain assurances regarding the payment of commissions and New World's responsibilities under the 2003 Dealer Agreement. (See Compl., Exhibit B.)  New World apparently interpreted this correspondence with Plaintiffs to mean that the parties were unable to reach an amicable separation. (See Matterne Aff. ¶ 16.)  As a result, on December 22, 2004, Matterne sent Plaintiffs another letter on behalf of New World clarifying that the termination of the 2003 Dealer Agreement was for cause. (See Compl., Exhibit B.)  The designation of the termination as one "for cause" was significant because it could potentially limit the commissions payable to Plaintiffs under the terms of the 2003 Dealer Agreement. (See Matterne Aff., Exhibit 3, §2.91(e).)  Ultimately, the 2003 Dealer Agreement terminated on March 7, 2005. (Matterne

3

Aff. ¶ 17.)

On March 10, 2005, after termination of the 2003 Dealer Agreement, Josko sent a letter containing a settlement offer to New World. (See Matterne Aff., Exhibit 4.)  In the letter, Josko advised that if the disputes between the parties did not settle, Josko would file a lawsuit in federal court and initiate arbitration proceedings. (Id.)  In response, on March 21, 2005, New World filed suit in the District Court for the Eastern District of Michigan seeking both a "declaration of contractual rights pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq." and "injunctive relief to preserve the status quo pending arbitration pursuant to the parties' written agreement." (See Barbiarz Aff., Exhibit 1.)  Simultaneously, on March 21, 2005, New World initiated arbitration proceedings with the American Arbitration Association ("AAA"). (See Barbiarz Aff., Exhibit 2.)

In the federal suit in Michigan, Josko and GTG filed an Answer on May 6, 2005.  In ¶ 22 of the Answer, Josko and GTG "denied" the allegation that "Defendants [Josko and GTG] intent to initiate litigation in state and/or federal court in New Jersey" although they noted that "it is admitted that New Jersey state and/or federal court would properly have jurisdiction over the parties." (Barbiarz Aff., Exhibit 3, ¶ 22.)  In paragraph ¶ 29 of the Answer, Josko and GTG "denied" the allegation that "[a]n actual controversy exists over the interpretation and enforceability of the arbitration provision of the [2003 Dealer] Agreement, which can be determined only by an adjudication in the nature of a declaratory judgment." (Id. ¶ 29.)  As to the AAA proceeding, Josko and GTG did not file an answering statement, nor did they object to jurisdiction of the AAA, the Michigan hearing location, or the arbitrability of New World's claims. (Barbiarz Aff. ¶ 6.)

Nevertheless, early on in the Michigan lawsuit and arbitration proceedings, the parties agreed that one of the main issues in dispute involved the number of sales Josko closed within ninety days of the termination of the 2003 Dealer Agreement. (See Safford Aff., Exhibit 1.)  This number was relevant because the 2003 Dealer Agreement provided that Plaintiffs could be entitled to commissions on those sales if the termination was not "for cause," and if certain other conditions were met. (See Matterne Aff., Exhibit 3, § 2.91.)  Therefore, the parties agreed to hold both the federal lawsuit and the AAA proceedings "in abeyance" until the ninety day period had expired. (Barbiarz Aff. ¶ 1; see Safford Aff., Exhibit 1.)

After the ninety day period ended, counsel for New World called counsel for Josko and GTG and asked whether Josko and GTG would claim entitlement to any additional commissions or any other relief from New World. (Safford Aff. ¶ 5.)  Counsel replied that he would discuss the matter with his client and then would get back to New World on the issue. (Id. ¶ 6.)  However, counsel for Josko and GTG never provided New World's counsel with an answer. (Id. ¶ 7.)

Thereafter, New World's counsel offered to voluntarily dismiss both the federal lawsuit in Michigan as well as the AAA arbitration. (Barbiarz Aff. ¶ 11.)  According to New World's counsel, the offer of dismissal was based upon (1) Josko/GTG's alleged representations in the federal lawsuit that they did not intend to initiate litigation in state and/or federal court in New Jersey, (2) Josko/GTG's alleged representation in the federal lawsuit that there was no controversy regarding the interpretation and enforceability of the arbitration provision in the Dealer Agreement, and (3) Josko/GTG's failure to specify any claims that they intended to raise after counsel for New World requested that they do so. (Id.)  Josko and GTG then accepted the

offer of voluntary dismissal.  The federal lawsuit was dismissed without prejudice on July 25, 2005, and the AAA proceedings were closed on August 11, 2005. (Id. §§ 12, 13.)

One day later, on August 12, 2005, Josko and GTG filed their Complaint in the current action before this Court.  In the Complaint, Plaintiffs seek (1) declaratory relief regarding the parties' rights and responsibilities under the 2003 Dealer Agreement, (2) an award of due commissions, (3) damages, (4) reinstatement to the position of an authorized New World dealer or franchisee, and (5) interest, costs, and attorney's fees.  In response, New World filed the present motion to dismiss, or alternatively, transfer venue.

## II. DISCUSSION

In the motion currently before the Court, New World seeks to enforce the arbitration clause in the parties' 2003 Dealer Agreement.  To that end, New World argues that the Court should either dismiss the above-captioned case or transfer it to the Eastern District of Michigan so that the district court there can compel arbitration.  In response, Josko makes several arguments.  First, he contends that New World waived its right to arbitrate by initiating and then voluntarily dismissing a prior lawsuit and arbitration proceeding relating to the parties' disputes under the 2003 Dealer Agreement.  Second, Josko asserts that he is entitled to a determination made by this Court as to whether the claims in his Complaint fall within the scope of the arbitration clause in the 2003 Dealer Agreement.  Third, Josko argues that transfer of this matter to the Eastern District of Michigan is inappropriate because (1) the Michigan court allegedly lacks personal jurisdiction over Josko, and (2) forum non conveniens factors counsel against such a transfer.  The Court will address these issues in turn.

### A. Arbitrability

The Federal Arbitration Act ("FAA") guarantees that any agreement to settle a dispute by arbitration in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1994).[1]  In enacting the FAA, "Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." Southland Corp. v. Keating, 465 U.S. 1, 10 (1984); Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 104 (3d Cir. 2000) (noting that FAA created "a strong federal policy in favor of compelling arbitration over litigation").  Moreover, Congress intended the FAA "to abrogate the then-existing common law rule disfavoring arbitration agreements 'and to place arbitration agreements upon the same footing as other contracts.'" Martindale v. Sandvik, Inc., 800 A.2d 872, 876 (N.J. 2002) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991)).

In terms of its substance, the FAA authorizes district courts to stay litigation and compel arbitration in certain circumstances.  In particular, when a party brings suit on an issue referable to arbitration under a written arbitration agreement, the district court shall "stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement." 9 U.S.C.

---

[1]To be a "transaction involving commerce," the contract need only have "the slightest nexus" to interstate commerce. Crawford v. West Jersey Health Systems, 847 F. Supp. 1232, 1240 (D.N.J. 1994).  Here, the 2003 Dealer Agreement satisfies this minimal requirement because (1) it involves a corporation engaged in interstate commerce; (2) it embodies an agreement between individuals and/or entities in Michigan and New Jersey; and (3) it authorizes the Plaintiff to act as a dealer in soliciting customers for Defendant's products in New Jersey, Maryland, Delaware, and parts of Pennsylvania. (See Materne Aff. ¶ 3.)  Therefore, the FAA applies to the arbitration clause in the 2003 Dealer Agreement because the contract has a clear nexus to interstate commerce.

§ 3.  In addition, upon application by an aggrieved party, the district court can order arbitration once it has heard the parties and is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4.  In other words, prior to enforcing an arbitration agreement, the Court must engage in a limited review to determine (1) whether there is a valid agreement to arbitrate, and (2) whether the specific dispute falls within the substantive scope of that agreement. Salvadori v. Option One Mortgage Corp., 420 F. Supp. 2d 349, 356 (D.N.J. 2006) (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 at 626-28 (1985)); see also AT&T Technologies, Inc. v. Commc'n Workers of Am., 475 U.S. 643, 648-49 (1986) (noting that it is axiomatic that a party cannot be required to arbitrate a dispute unless that party has previously entered into an agreement to do so).

        1.  Validity of Agreement to Arbitrate

        The first step in compelling arbitration is determining whether the parties have entered into a valid agreement to arbitrate. See Salvadori, 420 F. Supp. 2d at 356.  In this regard, an agreement to arbitrate is enforceable "save upon such grounds as exist at law or equity for the revocation of any contract," 9 U.S.C. § 2 , or unless Congress itself has "evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Mitsubishi Motors, 473 U.S. at 628.  "In conducting [the] limited review, the court must apply ordinary contractual principles, with a healthy regard for the strong federal policy in favor of arbitration." John Hancock Mut. Life Ins. Co. v. Olick, 151 F.3d 132, 137 (3d Cir. 1998) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).  To reiterate, only upon a showing of "fraud, duress, mistake, or some other ground recognized by the law applicable to contracts" may the federal court find an arbitration clause to be invalid. Seus v. John Nuveen &

8

Co., Inc., 146 F.3d 175, 185 (3d Cir. 1998).

Here, the parties signed and executed a written agreement to arbitrate certain claims relating to the 2003 Dealer Agreement. (See Matterne Aff., Exhibit 3.)  Neither party presents any plausible argument or evidence to suggest that the agreement itself is invalid due to fraud, duress, mistake, or any other ground recognized by the law of contracts. To the contrary, New World seeks to enforce the arbitration clause and Josko seeks a determination as to its scope. (See Def. Mem. at 11; Pl. Opp. at 14.)  In fact, in his opposition papers, Josko explicitly identifies the Court's two-pronged inquiry to determine arbitrability (i.e. that the Court must first determine whether there is a valid arbitration agreement, and second, determine whether the current dispute falls within the scope of that agreement); however, Josko states only that he "raises issues under the second prong" relating to the scope of the agreement to arbitrate. (See Pl. Mem. at 15.)

In addition, a review of the Complaint in this matter likewise reveals that Plaintiffs are not seeking to invalidate the arbitration clause contained in the 2003 Dealer Agreement.  Count I of the Complaint is the only count that even mentions the arbitration clause, and in that claim, the Plaintiff merely seeks a determination from the Court regarding the scope of the arbitration clause. (See Comal. ¶¶ 21-26.)  The other counts in the Complaint relate to different sections of the 2003 Dealer Agreement, such as the restrictive covenant provisions and termination provisions, and therefore, do not challenge the validity of the arbitration clause.  Accordingly, because there is no dispute regarding the validity of the agreement to arbitrate, the Court will turn to the issue of whether the claims in the Complaint fall within the substantive scope of the arbitration agreement.

2.  Scope of Agreement to Arbitrate

To determine the scope of an agreement to arbitrate, courts perform a "limited review of the parties' intent." John Hancock, 151 F.3d at 138; see Bruno v. Pepperidge Farm, Inc., 256 F. Supp. 865, 868 (E.D. Pa. 1966) ("In any dispute involving the interpretation of an arbitration clause, it is the court's primary duty to ascertain whether the matter at issue was intended to be included therein.").  The relevant analysis "depends upon the intent of the parties as it appears from the language used, its context within the instrument, and the circumstances surrounding its formation and execution." Bruno, 256 F. Supp. at 868.

In the present matter, Section 3.3 of the 2003 Dealer Agreement contains the parties' arbitration agreement.  Section 3.3 provides that,

> Except for matters involving a breach of the confidentiality paragraph provided herein, any controversy or claim arising out of or relating to this Agreement, or breach thereof, shall be settled in arbitration in accordance with the commercial rules then prevailing of the American Arbitration Association.  Any hearing or other legal proceeding required under this paragraph or otherwise shall be held in the County of Oakland, State of Michigan before a panel of three (3) arbitrators. Judgment upon any award rendered by the arbitrators may be entered in any court in Oakland County having competent jurisdiction thereof.

(See Matterne Aff., Exhibit 3.)  In other words, all claims relating to the Dealer Agreement are subject to arbitration unless they involve "a breach of the confidentiality paragraph" contained in that contract.  Indeed, the parties do not dispute that any claims involving a breach of the confidentiality provision are not subject to arbitration while all other disputes arising under the contract are arbitrable.

In turn, Section 3.1 of the Dealer Agreement contains the following confidentiality provision:

> Each party shall refrain from using or disclosing any confidential or proprietary

10

information except as permitted in connection with and under the terms of this
Agreement, and shall cause its employees and agents to refrain from using or
disclosing any confidential or proprietary information of the other or its products
or services.  For purposes of this Agreement, CONFIDENTIAL OR
PROPRIETARY INFORMATION is defined as information disclosed or obtained
by the other party in connection with and during the term of this Agreement and
designated as "Confidential" or is otherwise deemed a trade secret or proprietary
by the disclosing party.  CONFIDENTIAL INFORMATION shall not mean any
information which was previously known to the other party without obligation of
confidence or with breach of this Agreement, is publicly disclosed either before or
after the other party's receipt of such information, or is rightfully received by the
other party from a third party without obligation of confidence.  Both parties
acknowledge that technical specifications, software source code and
documentation, employee lists, names of customers and/or prospects are deemed
"Confidential and/or Proprietary".  DEALER agrees that it will have each
employee that may receive "Confidential or Proprietary" information from NEW
WORLD sign a non-disclosure agreement in the form set forth in Exhibit F or
such other reasonable format requested by NEW WORLD.

This provision concerning confidentiality shall survive termination of this
Agreement.  The parties agree that a breach of this confidentiality provision shall
be enforceable by injunction without the need for posting of a bond.

(See Materne Aff., Exhibit 3.)  Simply put, the confidentiality provision restricts Plaintiffs from

disclosing any of New World's confidential or proprietary information.

In his opposition papers, Josko argues that the claims in his Complaint implicate the

confidentiality provision contained in Section 3.1, and therefore, are not subject to arbitration

under the arbitration clause contained in Section 3.3.  Specifically, he appears to make two

arguments.  First, in the "statement of facts" portion of his opposition brief, Josko states that,

The confidentiality provision does not specifically set forth what information is
supposed to be subject to protection. . . . Josko seeks a determination as to the
confidentiality of what New World may claim is 'designated as Confidential,' is a
'trade secret' or is 'proprietary.'  Josko should not be forced to guess at his peril
what is and is not claimed by New World to be subject to protection.

(Pl. Opp. at 5.)  Second, in the argument section of his brief, Josko contends that "to the extent

that enforcement of any restrictive covenants against Josko by New World would be based upon

11

'confidentiality' issues; none of those issues is subject to arbitration." (Pl. Opp. at 16.)  In reply

to these allegations, New World points out that the Court does not have jurisdiction over these

confidentiality claims because they are not pled in the Complaint and, in any event, Josko has not

identified any breach of the confidentiality paragraph that would make these claims non-

arbitrable under the 2003 Dealer Agreement.

As a preliminary matter, before determining whether Josko's allegations regarding

confidentiality are arbitrable claims, the Court must first determine whether Plaintiffs have

properly pled any of the confidentiality claims that they raise in their opposition brief.  It is clear

that a plaintiff may not raise new claims for the first time in response to a motion to dismiss or

other dispositive motion. See Gueson v. Feldman, Civ. No. 00-1117, 2002 WL 32308678, *4

(E.D. Pa. Aug. 22, 2002) ("A plaintiff may not raise new claims in response to a motion to

dismiss"); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the

summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend

the complaint in accordance with Fed. R. Civ. P. 15(a)."); Shanahan v. City of Chicago, 82 F.3d

776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his

brief in opposition to a motion for summary judgment.").

With respect to Plaintiffs' pleadings in this case, Count I of the Complaint mentions the

confidentiality provision in the 2003 Dealer Agreement, but it does not contain any of the

allegations regarding confidentiality that Josko raises in his opposition papers.  Specifically, in

Count I, Josko states that the 2003 Dealer Agreement contains an arbitration clause that

"excluded from arbitration all claims regarding the enforceability of the confidentiality

provisions of the 2003 Agreement." (Compl. ¶ 23.)  Josko then concludes that "the claims

asserted herein are either not subject to arbitration or Defendant has knowingly and intentionally waived any claim or right to arbitration based on actions which are inconsistent with a demand for arbitration." (Compl. ¶ 25.)  Ultimately, in Count I Josko requests a declaratory judgment that "any claimed right to arbitrate either does not cover this dispute or that Defendant has waived such right." (Compl. ¶ 26.)  Despite the conclusory statement that Josko's claims are not arbitrable, nowhere in Count I does Josko make any allegations that reflect or imply a breach of the confidentiality provision.  Moreover, Count I does not contain a substantive claim against New World; rather, it seeks a declaration regarding the arbitrability of the substantive claims raised in the other counts of the Complaint.  Thus, the allegations regarding confidentiality contained in Josko's opposition papers were not raised in Count I of the Complaint.

Similarly, the other Counts in the Complaint do not allege any claims involving a breach of the confidentiality provision in the 2003 Dealer Agreement.  Count II seeks a declaratory judgment that "any claimed right to restrict the business of Plaintiffs is unenforceable, waived, or limited." (Compl. ¶ 30.)  In addition, Count II states that any restrictive covenants the Court finds to be enforceable should be limited in "scope, duration, and industry sector."[2] (Compl. ¶ 29.)

_____

[2]Josko makes a vague assertion in his opposition papers that disputes regarding restrictive covenants in the 2003 Dealer Agreement also implicate a breach of the confidentiality provision in Section 3.1. (See Pl. Opp. at 16.)  The Court finds this assertion unavailing.  First, Josko fails to present any argument or explanation to support this conclusion.  Second, a restrictive covenant is defined as "a promise, usually in a sale-of-business, partnership, or employment contract, not to engage in the same type of business for a stated time in the same market as the buyer, partner, or employer." BLACK'S LAW DICTIONARY (8th Ed. 2004).  Nothing in this definition suggests that a confidentiality clause is a restrictive covenant.  Third, Plaintiffs themselves refer to the confidentiality clause and the restrictive covenants as separate items. See Pl. Opp. at 4 ("In addition to the Confidentiality and Arbitration Clauses of the 2003 Dealership, the Agreement contains extensive Restrictive Covenant provisions.").  Fourth, in light of the language and structure of the 2003 Dealer Agreement, an allegation that the non-competition clauses are unenforceable is not the same thing as an allegation that there has been a breach of the distinctly

Counts III and IV contain allegations that New World has failed to pay Josko certain commissions that he claims are due to him under the 2003 Dealer Agreement. (Compl. ¶¶ 31-42.) Count V similarly alleges that the Plaintiffs are entitled to payment of all commissions due and owing along with damages and counsel fees under common law and the laws of Michigan, Pennsylvania, Maryland, New Jersey, and/or Delaware. (Compl. ¶ 44.) Count VI states that Plaintiffs are entitled to relief under applicable franchise laws due to New World's allegedly improper termination of Plaintiffs' franchise. (Compl. ¶ 46.) Count VII alleges that the anticompetitive provisions and/or restraints on trade in the 2003 Dealer Agreement should be invalidated under Michigan law. (Compl. ¶ 49.) Count VIII states that New World breached the 2003 Dealer Agreement in various ways; however, none of those alleged breaches includes an alleged breach of the confidentiality provision. (Compl. ¶¶ 51-54.) Finally, Count IX generally alleges that New World's conduct constitutes a breach of the duty of good faith and fair dealing. (Compl. ¶¶ 56-57.) Overall, contrary to Josko's assertions in his opposition papers, nothing in the Complaint alleges or involves a breach of the confidentiality paragraph contained in Section 3.1 of the 2003 Dealer Agreement.

---

separate confidentiality clause. Here, the non-competition clauses in the 2003 Dealer Agreement put limitations on the Plaintiffs' ability to compete with New World. In particular, these restrictions relate to Plaintiffs' ability to (1) provide competitive products to New World customers, (2) engage in a similar line of business as New World, (3) work for a New World competitor, and/or (4) act as a dealer or distributor of public sector software to certain New World targets. (See Matterne Aff., Exhibit 3, § 3.2.) Nothing in the non-competition clauses refers to the confidentiality clause in Section 3.1 or refers to Plaintiffs' ability to disclose confidential or proprietary information to third parties. In other words, the non-competition clauses and the confidentiality provision are distinct from each other both in form and substance. Given this distinction, and in light of the other foregoing reasons, the Court rejects Josko's contention that the allegations in his Complaint relating to the restrictive covenants also implicitly refer to a breach of the confidentiality clause.

Because the Complaint does not contain any allegations or claims involving a breach of the confidentiality provision in the 2003 Dealer Agreement, there are no non-arbitrable claims properly before this Court.  As all of the claims raised in Plaintiffs' Complaint fall within the substantive scope of the parties' arbitration agreement, the Court will stay all counts of the Complaint pending the completion of arbitration on those claims.  See 9 U.S.C. § 3 (directing courts to stay arbitrable counts pending arbitration).

### 3.  Waiver

In the alternative, Josko argues that even if the matters currently in dispute are arbitrable under the 2003 Dealer Agreement, New World has nonetheless waived its right to arbitration.  In particular, Josko contends that New World waived its right to arbitration when it voluntarily and unilaterally dismissed the AAA arbitration it previously initiated in March 2005.  In contrast, New World argues that it did not intend to waive its right to arbitrate under the 2003 Dealer Agreement, and moreover, the issue of waiver is a question for the arbitrator rather than the district court.

With respect to the waiver inquiry, the preliminary issue for this Court is whether waiver should be determined by the Court or referred to the arbitrator.  The Supreme Court has explained in general terms which issues should be decided by the Court and which should be left to the arbitrator.  See Howsam v. Dean Witter Reynolds, 537 U.S. 79 (2002).  In Howsam, the Court noted that "the question whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability,' is an 'issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" Id. at 83 (quoting AT & T Technologies, 475 U.S. at  649).  However, the Court explained that the phrase "question of arbitrability" did

not encompass every "potentially dispositive gateway question." Id.  Rather, the phrase "question of arbitrability" only applies where,

> . . . contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

Id. at 83-84.

In applying this definition, the Court drew distinctions between the gateway disputes that constitute proper "questions of arbitrability" for the court to decide and other gateway disputes that are for the arbitrator.  On one hand, the Court concluded that issues regarding whether the parties are bound by an arbitration clause, or whether a valid arbitration clause applies to a particular type of dispute, are questions of arbitrability for the court to decide. Id. at 84.  On the other hand, the Court found that "procedural questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide." Id. at 84 (citing John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964)) (emphasis in original). In this regard, the Court also noted that "the presumption is that the arbitrator should decide allegation[s] of waiver, delay, or a like defense to arbitrability." Howsam, 537 U.S. at 84 (citing Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25).

In the years following Howsam, several circuit courts have refused to decide issues of "waiver, delay, or a like defense to arbitrability" on the basis that they are issues for the arbitrator. See e.g., Banc One Acceptance Corp. v. Hill, 367 F.3d 426, 430 (5th Cir. 2004) (citing Howsam for the proposition that "[w]here a defense does not specifically relate to the arbitration agreement . . . it must be submitted to the arbitrator as part of the underlying dispute"); Klay v.

United Healthgroup, Inc., 376 F.3d 1092, 1109-1110 (11th Cir. 2004) (finding that issue of res judicata was for arbitrator to decide); Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 872 (8th Cir. 2004) (finding that "question of whether waiver occurred" was matter for the arbitrator); Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38, 351 F.3d 43, 46 (2d Cir. 2003) (finding that "equitable defense of repudiation" is a matter reserved to the arbitrator). Moreover, the Third Circuit has implied that similar issues are best left to the arbitrator under Howsam. See Windward Agency, Inc. v. Cologne Life Reinsurance Co., 123 Fed. Appx. 481, 484 (3d Cir. 2005) (noting that "we might well be compelled by Howsam to leave any issues of delay to the broad jurisdiction of the arbitrators"). Therefore, in accordance with the presumption established by the Supreme Court and followed by many of the Circuit Courts of Appeal, this Court finds that the question of whether New World waived its right to arbitrate is a matter for the arbitrator to decide.

### B. Transfer

At this point in the analysis, had the Plaintiff filed suit in the district embracing the contractually chosen arbitration forum, this Court could now compel the parties to arbitrate. See 9 U.S.C. § 4. However, rather than filing suit in the Eastern District of Michigan, Plaintiffs filed suit in the District of New Jersey where geographical and jurisdictional obstacles preclude this Court from compelling arbitration in accordance with the terms of the 2003 Dealer Agreement. See 9 U.S.C. § 4 (requiring that compelled arbitration be held "within the district in which the petition for an order directing such arbitration is filed"); Econo-Car Int'l, Inc. v. Antilles Car Rentals, Inc., 499 F.2d 1391, 1394 (3d Cir. 1974); Optopics Laboratories, Inc. v. Nicholas, 947 F.

Supp. 817, 824 (D.N.J. 1996).[3]  Therefore, to give effect to the FAA and the intent of the 2003

Dealer Agreement, this Court can either (1) stay proceedings so that New World can re-file in the

Eastern District of Michigan, or (2) transfer this matter to the Eastern District of Michigan

pursuant to 28 U.S.C. §§ 1404(a) or 1406(a). See Alpert v. Alphagraphics Fanchising, Inc., 731

F. Supp. 685, 689 (D.N.J. 1990) (staying proceedings to allow movants to petition an authorized

court to compel arbitration); Optoptics, 947 F. Supp. at 825 (transferring venue to a district

authorized to compel arbitration).[4]  In the interest of judicial efficiency, this Court chooses the

---

[3]In its reply papers, New World recognizes the Supreme Court's decision in Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co., 529 U.S. 193 (2000).  In Cortez Byrd Chips, the Court addressed the issue of whether Sections 9-11 of the FAA "are restrictive, allowing a motion to confirm, vacate, or modify an arbitration award to be brought only in the district in which the award was made, or are permissive, permitting such a motion either where the award was made or in any district proper under the general venue statute." Cortez Bird Chips, 529 U.S. at 195. Although the Court held that those specific provisions of the FAA were permissive, courts interpreting Cortez Byrd Chips have found that the decision does not affect the rule under 9 U.S.C. § 4 that, where parties have contractually selected a specified arbitration forum, only a district court encompassing that forum may compel arbitration in the contractually-chosen location. See e.g., Ansari v. Qwest Commc'n Corp., 414 F.3d 1214, 1219-1220 (10th Cir. 2005) (highlighting the difference between the permissive language in §§ 9-11 and the compulsory language in § 4).  As the Ansari court recognized, the majority of courts take the view that "where the parties agreed to arbitrate in a particular forum only a district court in that forum has authority to compel arbitration under § 4." Id. at 1219-1220 (citing Inland Bulk Transfer Co. v. Cummins Engine Co., 332 F.3d 1007, 1018 (6th  Cir. 2003); Mgmt. Recruiters Int'l, Inc. v. Bloor, 129 F.3d 851, 854 (6th Cir. 1997); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer, 49 F.3d 323, 327 (7th Cir. 1995); Econo-Car Int'l, Inc. v. Antilles Car Rentals, Inc., 499 F.2d 1391, 1394 (3d Cir. 1974); Snyder v. Smith, 736 F.2d 409, 420 (7th Cir. 1984), overruled on other grounds by Felzen v. Andreas, 134 F.3d 873, 877 (7th Cir. 1998); Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc., 269 F. Supp. 2d 356, 363 (S.D.N.Y. 2003); Roe v. Gray, 165 F. Supp. 2d 1164, 1173 (D. Colo. 2001)).

[4]The Defendant's motion papers actually ask the Court to dismiss the case, or in the alternative, transfer or stay the matter. (See Def. Mem. at 13.) Although some courts have chosen to dismiss an action in favor of arbitration, particularly where all of the issues in the case are arbitrable, see, e.g., Lewis Tree Serv., Inc. v. Lucent Tech., Inc., 239 F. Supp. 2 d 332, 340 (S.D.N.Y. 2002); Reynolds v. Halliburton, 217 F.Supp.2d 756, 758 (E.D. Tex. .2002), the Third

latter option, and will transfer this matter to the Eastern District of Michigan pursuant to §

1404(a).[5]

---

Circuit has indicated that the statutory language regarding the FAA stay procedure is mandatory, such that when any or all claims are arbitrable, the case must be stayed. Lloyd v. Hovensa, LLC, 369 F.3d 263, 269 (3d Cir. 2004) (finding that the language in § 3 of the FAA which states that "the Court 'shall' enter a stay simply cannot be read to say that the Court shall enter a stay in all cases except those in which all claims are arbitrable and the Court finds dismissal to be the preferable approach"). Accordingly, the Court will not dismiss the case, even though all the claims in the Complaint are arbitrable under the parties' agreement.

[5]The Court has the authority to transfer cases pursuant to either 28 U.S.C. § 1404(a) or 28 U.S.C. § 1406. When faced with circumstances similar to the situation presented in this matter, some district courts have chosen to transfer all arbitrable claims pursuant to § 1406. See e.g., Viets v. Andersen, No. 03-682, 2003 WL 21525062, *10 (S.D. Ind. June 26, 2003); Bao v. Gruntal & Co., 942 F. Supp. 978, 984 (D.N.J. 1998); Bosworth v. Ehrenreich, 823 F. Supp. 1175, 1180 (D.N.J. 1993). However, a closer look at the language of § 1406 in light of Third Circuit precedent suggests that, in this case, perhaps the more appropriate course is to analyze the transfer in this matter pursuant to § 1404. See Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir. 1995).

In Jumara, the underlying dispute between the parties arose out of two insurance contracts. Id. at 876. The lower court determined that the contracts contained arbitration provisions calling for the arbitration of disputes in Pennsylvania state court. Id. at 875. Relying upon the forum selection clause, the district court for the Eastern District of Pennsylvania denied the plaintiff's motion to compel arbitration and effectively dismissed the Complaint pursuant to § 1406. Id.; see 28 U.S.C. § 1406 (authorizing district courts to dismiss cases brought in the "wrong venue" or transfer them in the interests of justice). In other words, because the parties' contracts rendered the underlying dispute arbitrable in Pennsylvania state court, the district court found that venue was improper in the Eastern District of Pennsylvania.

On appeal, the Third Circuit disagreed with the district court's decision to rely upon § 1406. Id. at 875, 879. As a preliminary matter, the Court noted that federal law governed the district court's determination "whether to grant a motion to transfer a diversity case to the venue provided in the contractual forum selection clause." Jumara, 55 F.3d at 877-78 (citing Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 28 n.8 (1988)). Then, after noting that federal venue questions are governed by either § 1404 or § 1406, the Court explained the difference between the two provisions. Id. at 878. Specifically, the Court reiterated that "Section 1404 provides for a transfer of a case where both the original and the requested venue are proper" whereas "[s]ection 1406, on the other hand, applies where the original venue is improper and provides for either transfer or dismissal of the case." Id. Therefore, to determine which statute should have governed the district court's analysis, the Court had to analyze whether venue was proper in the

Pursuant to § 1404(a) and "for the convenience of parties and witnesses and in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  Given that subject matter jurisdiction in this action is based upon diversity jurisdiction, the matter could have been brought in the Eastern District of Michigan because the Defendant (i.e. New World) resides in Michigan and is subject to personal jurisdiction there.  See 28 U.S.C. § 1391(a) (establishing the requirements for proper venue in diversity actions).  Josko argues, nonetheless, that transfer to the Eastern District of Michigan is improper because he is not subject to personal jurisdiction there.

---

Eastern District of PA.  Id.  Under the federal venue statute, 28 U.S.C. § 1391, venue was proper in the Eastern District of Pennsylvania because the defendant corporation conducted business in that jurisdiction, and therefore, was subject to personal jurisdiction there.  Id. at 878-79. (citations omitted).  Because venue was proper in the Eastern District of Pennsylvania (i.e., the venue where the plaintiff's action was commenced), the district court's dismissal under § 1406 constituted an error of law.  Jumara, 55 F.3d at 879.  The Third Circuit stated that the district court should have applied the appropriate balancing test under § 1404 to determine whether the case should have proceeded in the Eastern District of Pennsylvania or should have been transferred to the federal district encompassing the contractually chosen arbitration forum.  Id.

Like Jumara, the current action was originally brought in a district court that constitutes a proper venue under § 1391.  Here, neither party disputes that New World is subject to personal jurisdiction in the District of New Jersey, as it seems clear that New World transacts business in New Jersey by soliciting customers and selling its products there.  See 28 U.S.C. § 1391(c) (venue proper in judicial district in which corporation is doing business); see also Stewart Org., Inc., 487 U.S. at 29 n. 8 ("The parties do not dispute that the District Court properly denied the motion to dismiss the case for improper venue under 28 U.S.C. § 1406(a) because respondent apparently does business [there].").  Accordingly, like the Third Circuit analysis in Jumara, this Court's transfer analysis should proceed under §1404, rather than §1406.  The Court recognizes that this analysis is somewhat awkward here because the Court will be weighing the convenience of *litigating* a case in two different fora after the Court has already determined that all of the claims in the case are subject to arbitration.  Nevertheless, it is possible that such claims may not all be resolved by arbitration, and in any event, it appears that the §1404(a) analysis is required by the governing federal law.

1.  Personal Jurisdiction

To determine whether a court can exercise personal jurisdiction in a diversity case, the court must conduct a two-step analysis.  First, the court must determined whether the state long-arm statute authorizes jurisdiction over a non-resident party, and second, the court must determine whether the exercise of jurisdiction is consistent with due process. IMO Indus., Inc. v. Keikert AG, 155 F.3d 254, 258-59 (3d Cir. 1998); Nat'l Can Corp. v. K Beverage Co., 674 F.2d 1134, 1136 (6th Cir. 1982).  However, under Michigan law, this analysis usually collapses into one step because the relevant Michigan long-arm statute permits the exercise of personal jurisdiction to the fullest limits of due process. See Coffee Beanery, Ltd. v. Powell, 932 F. Supp. 980, 983 (E.D. Mich. 1996) (citing Nat'l Can, 674 F.2d at 1136; Sifers v. Horen, 188 N.W.2d 623 (Mich. 1971); City Suburban Agency v. Dade Helicopter Services, Inc., 366 N.W.2d 259 (Mich. Ct. App. 1985)); see also Mich. Comp. Laws §600.705.[6]

The general constitutional standard for the exercise of personal jurisdiction was established by the Supreme Court in International Shoe Co. v. Washington, et al., 326 U.S. 310 (1945). In International Shoe, the Court explained that, to exercise jurisdiction over a non-resident party not present in the forum jurisdiction, that party must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional

---

[6] In the opposition papers, Plaintiffs argue that the Eastern District of Michigan lacks personal jurisdiction over Josko.  However, to support this assertion, Josko relies on Michigan's statute governing the exercise of *general* jurisdiction (i.e., Mich. Comp. Laws § 600.701), rather than Michigan's long-arm statute governing the exercise of *limited* jurisdiction (i.e., Mich. Comp. Laws § 600.705).  Josko's reliance upon § 600.701 is misplaced in this context because the Michigan court's exercise of jurisdiction in this case would be based upon Josko's relationship with the forum state relating to the 2003 Dealer Agreement and the disputes thereunder. See Sifers v. Horen, 188 N.W.2d 623, 623-24 (Mich. 1971) (recognizing the difference in applicability between § 600.701 and § 600.705).

notions of fair play and substantial justice.'" <u>Int'l Shoe</u>, 326 U.S. at 316.

     When applying these principles, the Sixth Circuit employs a three-part inquiry to determine whether an exercise of personal jurisdiction comports with due process. <u>Southern Mach. Co. v. Mohasco Indus., Inc.</u>, 401 F.2d 374, 381 (6th Cir. 1968). This tri-partite test provides:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

<u>Id.</u>

     With respect to the first prong, "purposeful availment is present where the defendant's contacts with the forum state 'proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.'" <u>Neogen Corp. v. Neo Gen Screening, Inc.</u>, 282 F.3d 883, 889 (6th Cir. 2002) *(*quoting <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 475 (1985)) (emphasis in original). This purposeful availment requirement serves to ensure "that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." <u>Calphalon Corp. v. Rowlette</u>, 228 F.3d 718, 721-22 (6th Cir. 2000).

     As to the second prong, the requirement that the cause of action must arise from the defendant's activities in the forum state is not construed strictly. <u>Tindall v. One 1973 Ford Mustang</u>, No. 05-73467, 2006 WL 1329168, *3 (E.D. Mich. May 16, 2006). Rather, it is "only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact]." <u>Southern Mach.</u>, 401 F.2d at 384 n. 29. That is to say, where the cause of action has "[a] substantial connection

22

with defendant's in-state activities," it is not necessary that it formally arise from defendant's contacts with the forum. Tindall, 2006 WL 1329168, at *3 (citing Third Nat'l. Bank in Nashville v. WEDGE Group, Inc., 882 F.2d 1087, 1091 (6th Cir. 1989)).

Finally, as to the third prong, an "inference arises that the third element has been met if the party opposing jurisdiction has satisfied the first two prongs of the test." Id. at *4 (citing Bird v. Parsons, 289 F.3d 865, 875 (6th Cir. 2002)). It is only "in a rare instance [that] the reasonableness portion of the test [will] be found lacking where the first two parts of the test are satisfied." Coffee Beanery, Ltd., 932 F. Supp. at 983 (citing Theunissen v. Matthews, 935 F.2d 1454, 1460 (6th Cir. 1991)).

Here, New World presents affidavit evidence that relates to the relevant factors in the constitutional test for personal jurisdiction. New World presents evidence that Josko: (1) entered a contract wherein he consented that Michigan law should govern any disputes arising thereunder; (2) entered into two Dealer Agreements whereby he agreed to serve as a dealer of products produced in Michigan by a Michigan corporation; (3) contacted New World in Michigan by phone, letter and email on numerous occasions to discuss prospective sales to third parties and to negotiate the dealer agreements; (4) attended meetings several times a year at New World's corporate offices in Michigan; and (5) invited prospective customers to join him on a visit to New World's Michigan office. (See Matterne Reply Aff. ¶¶ 4-10.) First, by attending business meetings at New World's offices in Michigan and repeatedly contacting New World in Michigan by phone, letter, and email regarding his business dealings under the 2003 Dealer Agreement, Josko has purposely availed himself of the "privilege of acting in Michigan or causing a consequence there." Southern Mach., 401 F.2d at 381; Gen. Motors Corp. v. Ignacio Lopez de

Arriortua, 948 F. Supp. 656, 663 (E.D. Mich. 1996) ("If the nonresident conducted business,

committed a tort, or furthered a tortious scheme in the forum, even by way of phone call or

written correspondence to the forum, personal jurisdiction is appropriate."); see Onderik v.

Morgan, 897 F.2d 204 (6th Cir. 1989) (finding that court had personal jurisdiction over the

defendant where defendant's contact with Michigan was by way of telephone and

correspondence); Sifers, 188 N.W.2d at 624 (noting that a defendant's contract negotiations in

Michigan constituted the "transaction of business" sufficient to justify the exercise of personal

jurisdiction).  Not only that, but in the 2003 Dealer Agreement, Josko consented to have

Michigan law govern any disputes arising under the contract. See Burger King Corp. v.

Rudzewicz, 471 U.S. 462, 482 (1985) (noting that a choice-of-law provision invoking the laws of

the forum state is evidence that a party purposely availed himself of the benefits and protections

of the forum state's law).  Second, Josko's contacts with Michigan have a "substantial

connection" to the current lawsuit because both those contacts and the current dispute relate to the

creation  of the 2003 Dealer Agreement, as well as the parties' rights, responsibilities, and

performance thereunder. CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1267 (6th Cir. 1996) ("If a

defendant's contacts with the forum state are related to the operative facts of the controversy, then

an action will be deemed to have arisen from those contracts.").  As a result, Josko's contacts

with Michigan satisfy the "arising under" prong of the constitutional test for personal jurisdiction.

Given these circumstances, the Court finds that Josko has sufficient contacts with

Michigan to justify the reasonable exercise of jurisdiction over him in the Eastern District of

Michigan.  Although Josko argues that it would be inconvenient for him to adjudicate his claims

in Michigan, he agreed to arbitrate these disputes in Michigan under Michigan law. See St. Paul

24

Fire & Marine Ins. Co. v. Courtney Enter., Inc., 270 F.3d 621, 624 (8th Cir. 2001) ("if the court in the selected forum did not have personal jurisdiction to compel arbitration, the agreement to arbitrate would be effectively unenforceable, contrary to the strong national policy in favor of arbitration."). Under these circumstances, the exercise of personal jurisdiction over Josko in Michigan would not offend traditional notions of fairness or substantial justice.

Overall, because Josko's contacts with Michigan are sufficient to satisfy the constitutional demands of due process,[7] personal jurisdiction issues do not preclude this Court from transferring this matter to the Eastern District of Michigan.  Thus, the Court will now turn its attention to the relevant venue analysis.

## 2.  Private and Public Factors Affecting Transfer Analysis

When deciding motions to transfer venue pursuant to 28 U.S.C. § 1404, courts examine "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995) (quoting 15 Wright, Miller & Cooper § 3847).  The relevant factors relate to both public and private interests.  The private interests include (1) the parties' preferences; (2) whether the claim arose elsewhere; (3) the convenience of the parties; (4) the convenience of witnesses, but only to the extent that witnesses may be actually

---

[7]The Court notes that even if the law had required a separate analysis under Michigan's long-arm statute, that analysis would likewise demonstrate that Josko's contacts satisfy the state's personal jurisdiction requirements. The Michigan Supreme Court has interpreted the long-arm statute to mean that even the transaction of "the slightest" business within Michigan is sufficient to establish personal jurisdiction. See Sifers, 188 N.W. 2d at 624 n.2 (noting that the term "transaction of any business" includes "each" and "every" transaction of business, such that even the "slightest" will suffice to satisfy the long-arm statute).  Josko's attendance at business meetings in Michigan combined with his business-related phone, email, and telephone correspondence with New World in Michigan certainly meet this basic requirement.

be unavailable for trial in one of the fora; and (5) the location of books and records, but only to the extent that files could not be produced in the alternative forum. Id.  The public interests include (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with any applicable state law. Id. at 879-80.

    With respect to the parties' preferences, contractual arbitration clauses designating an arbitration location are considered "manifestations of the parties' preferences as to a convenient forum." Id. at 880.  Accordingly, such clauses are afforded "substantial consideration." Id. Moreover, although it is normally the defendant's burden to establish the appropriateness of a transfer, where the parties have contractually chosen an appropriate venue, the plaintiff bears the burden of showing why the parties should not be bound by their contractual choice of forum. Jumara, 55 F.3d at 880; Optopics, 947 F. Supp. at 825-26.

    As to the relevant private factors, the convenience of the parties and witnesses and the location of documents do not clearly favor either forum.  Josko contends that it would be inconvenient and costly for him and the non-party witnesses to travel to Michigan because they all reside in Josko's sales territory (i.e., Pennsylvania, New Jersey, Delaware, and/or Maryland). (See Pl. Opp. at 19.)  Although it seems plausible that testimony from some individuals in Josko's territory could be necessary, particularly with respect to his claims for payment of commissions, it seems equally plausible that a significant portion of the necessary documentation and witness testimony would have to come from New World and its offices and employees in Michigan.

Moreover, there is no evidence that any witnesses from Josko's sales territory would be totally unavailable in Michigan as opposed to merely inconvenienced by the distance.  In addition, the private factor regarding where the cause of action arose does not clearly weigh in favor of either fora because it appears from the parties' submissions that the 2003 Dealer Agreement was negotiated across state lines through various forms of correspondence and communication. (See Matterne Reply Aff. ¶ 6.)

By contrast, the public factors weigh in favor of transferring the action to the Eastern District of Michigan.  As mentioned above, this Court lacks the clear authority to compel arbitration under 9 U.S.C. § 4, whereas the Eastern District of Michigan does not lack such authority.  Because the Michigan court has this added authority, it appears that proceeding in the Eastern District of Michigan would "be easier, more expeditious, and as a result, less expensive." See Optopics, 947 F. Supp. at 826.  Also, the public policy consideration does not clearly favor either fora as the public policies of both fora derive from federal law. See id. (citing FAA, 9 U.S.C. §§ 1-16.) Similarly, the disputes at issue potentially relate not only to the actions, rights and responsibilities of Josko in New Jersey, Pennsylvania, Maryland, and/or Delaware, but they certainly involve the actions, rights, and responsibilities of the Defendant corporation which is a Michigan corporation with its corporate headquarters located in Michigan. Therefore, it is not clear that this is a "local controversy" of a single state that ought to be decided at home. However, the 2003 Dealer Agreement does provide that disputes relating to the agreement are governed by Michigan law. (See Matterne Aff., Exhibit 3.)  Presumably, a district judge in the Eastern District of Michigan has more familiarity with Michigan law than this Court.  As a result, the public factor regarding familiarity with state law weighs in favor of a transfer.

Altogether, Josko fails to meet his burden of showing the level of convenience required to overcome the presumption created by the parties' forum-selecting arbitration clause. See Jumara, 55 F.3d at 880 (noting that plaintiff has to burden of showing "why they should not be bound to their contractual choice of forum").  As discussed above, the relevant public and private factors are either inconclusive as to the preferable forum, or they actually weigh in favor of transferring the case to the Eastern District of Michigan.  Because none of the relevant considerations weighs in favor of continuing this action in the District of New Jersey, the Court will transfer the action to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404 so that the court there can compel arbitration in the contractually-chosen forum.

## III.  CONCLUSION

For the foregoing reasons, this Court will grant in part and deny in part the Defendant's Motion to Dismiss, or in the Alternative, Transfer Venue.  Because the Court finds that all counts in the Plaintiffs' Complaint are arbitrable, the Court will stay those counts pending completion of arbitration.  However, because the Court lacks clear statutory authority to compel arbitration in Michigan, the Court will transfer the case to the District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1404.  After the transfer, the Defendant may file a proper motion to compel arbitration before the Eastern District of Michigan as that court has the necessary statutory authority to compel arbitration in this matter.  The accompanying Order shall issue this date.

Dated:      8-29-06                                   s/ Robert B. Kugler
                                                      ROBERT B. KUGLER
                                                      United States District Judge